1 | JEAN PIERRE NOGUES (SBN 84445), jpn@msk.com
LUCIA E. COYOCA (SBN 128314), lec@msk.com
2 | MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
3 | Los Angeles, California 90064-1683
Telephone: (310) 312-2000
4 | Facsimile: (310) 312-3100

5 | Attorneys for Plaintiffs

```
                                    FILED
                          CLERK, U.S. DISTRICT COURT

                                OCT - 6 2010

                          CENTRAL DISTRICT OF CALIFORNIA
                          BY_____ DEPUTY
```

6

7

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10

11 | RONALD TUTOR, an individual;
DAVID BERGSTEIN, an individual:
12 | CAPCO U.S. FILM HOLDINGS LLC, a
Delaware limited liability company;
13 | CAPITOL FILMS GROUP LIMITED, a
United Kingdom limited liability
14 | company; CAPCO TF HOLDINGS
LLC, a Delaware limited liability
15 | company; CF ACQUISITIONS LLC, a
Delaware limited liability company; TF
16 | ACQUISITION CORPORATION, a
Delaware corporation; TF CANADA
17 | ACQUISITION CORPORATION, a
corporation organized under the laws of
18 | Ontario, Canada; FPLAC LLC, a
Delaware limited liability company;
19 | ZOOPRAXIS FILM ASSETS LLC, a
Delaware limited liability company;
20 | STOPPING POWER PRODUCTIONS
LLC, a Delaware limited liability
21 | company; BLAC LLC, a Delaware
limited liability company ; SHERIDAN
22 | SQUARE ENTERTAINMENT INC., a
Delaware Corporation; SSE
23 | GUARANTY COMPANY, a Delaware
Corporation; BT MUSIC LLC, a
24 | Delaware limited liability company;
CAPITOL FILMS PARTNERS
25 | LIMITED, a private limited company
registered under the laws of England and
26 | Wales; SANDFAIRY PRODUCTIONS
LIMITED, a private limited company
27 | registered under the laws of England and
Wales; SANDFAIRY

| CASE NO.  CV 10-06867 DSF (AJWx)

**SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF; DAMAGES & PENALTIES UNDER CIVIL CODE § 1916.12-1 ET SEQ. AND CAL. CONST. ART. XV, §1; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER LIABILITY; AND DAMAGES FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961 ET SEQ.**

Complaint Filed In State Court:
April 27, 2010

First Amended Complaint Filed In
State Court:        August 16, 2010

Case Removed:       September 15, 2010

DEMAND FOR JURY TRIAL

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

COPY

MERCHANDISING LIMITED, a
private limited company registered under
the laws of England and Wales;
HARMONY PRODUCTIONS (UK)
LIMITED, a private limited company
registered under the laws of England and
Wales; BEAUTIFUL FILMS LIMITED,
a private limited company registered
under the laws of England and Wales;
REEL LUCKY LIMITED, a private
limited company registered under the
laws of England and Wales;
BORDERTOWN PRODUCTIONS
INC., a California corporation;
BORDERTOWN PRODUCTIONS
LLC, a Delaware limited liability
company; PSAMMEAD
PRODUCTIONS (IOM) LIMITED, a
limited company organized under the
laws of the Isle of Man; LAKE
PRODUCTIONS INC., a California
corporation; LAKE DISTRIBUTION
INC., a California corporation; DEAD
FISH DISTRIBUTION INC., a
California corporation; CHAOS
DISTRIBUTION INC., a California
corporation; MOBIUS .45
PRODUCTIONS LLC, a Delaware
limited liability company; MOBIPROD
06 INC., a Delaware corporation;
WENDELL PRODUCTIONS INC., a
California Corporation; WENDELL
DISTRIBUTION INC., a California
corporation; NM PRODUCTIONS LLC,
a Delaware limited liability company;
PRODUCTION MANAGEMENT
SERVICES LLC, a Delaware limited
liability company; CAPITOL FILMS
U.S. LLC, a Delaware limited liability
company; CAPITOL FILMS
PRODUCTION LLC, a Delaware
limited liability company; REEL
TRANSIT INVESTMENTS LLC, a
Louisiana limited liability company;
REEL TRANSIT PRODUCTIONS
LLC, a Louisiana limited liability
company; CAPITOL FILMS
PRODUCTIONS LIMITED, a private
limited company registered under the
laws of England and Wales; REEL
DUSTY LLC, a California limited
liability company; REEL SNOWY LLC,
a California limited liability company;
REEL DEVILISH LTD., a private

Mitchell
Silberberg &
Knupp LLP

2961239.2

1   limited company registered under the
    laws of England and Wales; REEL
2   TRANSIT LLC, a Nevada limited
    liability company; REELY GOOD
3   TIMES LIMITED, a private limited
    company registered under the laws of
4   England and Wales; TF CANADIAN
    LIBRARY HOLDING LLC, a Delaware
5   limited liability company; TF CANADA
    SERVICES CORPORATION, an
6   Ontario, Canada corporation; FOTP
    PRODUCTIONS INC., an Ontario,
7   Canada corporation; FIVE DOLLAR
    PRODUCTIONS LLC, a Delaware
8   limited liability company; REEL
    CLANDESTINE LLC, a Nevada limited
9   liability corporation; FADE OUT
    PRODUCTIONS LLC, a Delaware
10  limited liability company; TBT
    PRODUCTIONS LLC, a Delaware
11  limited liability company;
    CLAIRVOYANT PRODUCTIONS
12  INC., a California corporation; THE
    LAST WORD MOVIE LLC, a Delaware
13  limited liability company;
    SCHEHEREZADE FILMS LIMITED, a
14  private limited company registered under
    the laws of England and Wales; REEL
15  MARY LIMITED, , a private limited
    company registered under the laws of
16  England and Wales; REEL MARY
    PRODUCTIONS LIMITED, a private
17  limited company registered under the
    laws of England and Wales; CHAOTIC
18  UK LIMITED, a private limited
    company registered under the laws of
19  England and Wales; CHAOTIC
    PRODUCTIONS LTD., a British
20  Columbia Canada corporation;
    LAVENDAR PRODUCTIONS LLC, a
21  Delaware limited liability company;
    CERULEAN PRODUCTIONS LLC, a
22  Delaware limited liability company; and
    LIBRARY ASSET ACQUISITION
23  COMPANY LTD., a company organized
    under the laws of England and Wales,

24
                    Plaintiffs,
25
            v.
26
    DANIEL B. ZWIRN, an individual;
27  STEVEN CAMPBELL, an individual;
    D.B. ZWIRN SPECIAL
28

                                2

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1   OPPORTUNITIES FUND LLC, a
    Delaware limited liability company (now
2   known as Fortress Value Recovery Fund
    I LLC); BERNARD NATIONAL LOAN
3   INVESTORS Ltd., a Cayman Islands
    limited liability corporation; HEMLOCK
4   (Lux) S.a.r.l., a Luxembourg limited
    liability company; D.B. Zwirn & Co.
5   L.P., a Delaware limited partnership;
    FORTRESS INVESTMENT GROUP,
6   LLC, a Delaware limited liability
    company; and DOES 1-100, inclusive,
7
                Defendants.
8

9

10       Plaintiffs Ronald Tutor, David Bergstein, Capco U.S. Films Holdings, LLC,

11   Capitol Films Group Limited, Capco TF Holdings LLC,  CF Acquisitions LLC, TF

12   Acquisition Corporation, TF Canada Acquisition Corporation, FPLAC LLC,

13   Zoopraxis Film Assets LLC,  Stopping Power Productions LLC, BLAC LLC,

14   Sheridan Square Entertainment Inc., SSE Guaranty Company, BT Music LLC,

15   Capitol Films Partners Limited, Sandfairy Productions Limited, Sandfairy

16   Merchandising Limited, Harmony Productions (UK) Limited, Beautiful Films

17   Limited, Reel Lucky Limited, Bordertown Productions Inc., Bordertown

18   Productions LLC, Psammead Productions (IOM) Limited, Lake Productions Inc.,

19   Lake Distribution Inc., Dead Fish Distribution Inc., Chaos Distribution Inc., Mobius

20   .45 Productions LLC, Mobyprod 06 Inc., Wendell Productions Inc., Wendell

21   Distribution Inc., NM Productions LLC, Production Management Services LLC,

22   Capitol Films U.S. LLC, Capitol Films Production LLC, Reel Transit Investments

23   LLC, Reel Transit Productions LLC, Capitol Films Production Limited, Reel Dusty

24   LLC, Reel Snowy LLC, Reel Devlish Ltd., Reel Transit LLC, Reely Good Times

25   Limited, TF Canadian Library Holdings LLC, TF Canada Services Corporation,

26   FOTP Productions Inc., Five Dollar Productions LLC, Reel Clandestine LLC, Fade

27   Out Productions LLC, TBT Productions LLC, Clairvoyant Productions Inc., The

Mitchell
Silberberg &
Knupp LLP   28
2961239.2
                                            3
    ────────────────────────────────────────────────────────────────
    SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
    DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
    LIABILITY AND RICO VIOLATIONS

1   Last Word Movie LLC, Scheherezade Films Limited, Reel Mary Limited, Reel

2   Mary Productions Limited, Chaotic Films UK Limited, Chaotic Productions Ltd.,

3   Lavender Productions LLC, Cerulean Productions LLC, and Library Asset

4   Acquisition Company Ltd. (collectively "Plaintiffs") allege as follows:

5       1.     This lawsuit is a variation on a theme that is all too familiar: The

6   greed of the finance industry and its impact on the businesses that borrow from

7   them. The defendant hedge fund lenders in this case loaned money to Plaintiff

8   borrowers, and in return, charged and collected millions of dollars in interest

9   payments, loan fees, and penalty payments which Plaintiffs other than LAAC

10   contend were usurious and illegal. Faced with mounting calls for redemptions by

11   their investors, an internal audit revealing extensive financial improprieties, and an

12   SEC investigation of their business practices, defendant lenders then lured Plaintiffs

13   other than Library Asset Acquisition Company Ltd. ("LAAC") into a new even

14   higher interest rate loan transaction, by falsely promising that they would extend a

15   $250 million overall revolving credit facility to Plaintiffs other than LAAC.

16       2.     Lenders insisted however, that, as a predicate to the new $250 million

17   credit facility, Plaintiffs other than LAAC had to refinance their existing loans (none

18   of which were then at maturity) into higher interest bearing loans with individual

19   guarantees signed by Tutor and Bergstein, even though in most cases no such

20   personal guaranties or more limited guaranties had been provided on the original

21   loans. Lenders lured said Plaintiffs into new loan agreements, claiming that they

22   were merely "temporary" and a necessary predicate before the $250 million

23   revolving credit facility could be extended to said Plaintiffs. Lenders then imposed

24   and collected millions of dollars in usurious and unconscionable interest from

25   borrowers, as well as exorbitant fees and penalties, and asserted a unilateral right to

26   sweep monies out of Plaintiffs borrowers' accounts for trumped up loan violations.

27

28

Mitchell
Silberberg &
Knupp LLP
2961239.2

4

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

3.      Of course, after the new loan fees had been paid, the transaction costs incurred, the new personal guarantees had been provided, and millions of dollars in usurious interest paid, lenders reneged on their agreement to provide the $250 million credit facility.  Indeed, Plaintiffs learned subsequently that lenders could never have extended the $250 million credit facility despite their repeated representations that they would do so, because lenders were in a financial crisis, faced billions of dollars in redemptions demanded by their investors, and had been unable to raise new funds since at least January 2007, after financial irregularities had been discovered.  This situation ultimately resulted in lenders being liquidated, their funds being taken over by defendant Fortress Investment Group, LLC ("Fortress") and defendants' principle, defendant David B. Zwirn, being sued for fraud, for diversion of millions of dollars of investors' monies for his personal use and other wrongs.  In this action, Plaintiffs seek declaratory relief, rescission and restitution, and damages based upon the aforementioned fraud and other wrongful conduct by defendants.

## THE PARTIES

4.      Plaintiffs are two individuals, and a group of entertainment production, acquisition, and distribution companies which are in the business of developing, producing, and distributing motion pictures.  They are:

(a)      Ronald Tutor, an individual;

(b)      David Bergstein, an individual;

(c)      Capitol Films Group Ltd. ("CFG"), a limited liability company organized under the laws of the United Kingdom;

(d)      CF Acquisitions LLC ("CFA"), a Delaware limited liability company;

(e)      FPLAC LLC ("FPLAC"), a Delaware limited liability company;

Mitchell
Silberberg &
Knupp LLP
2961239.2

5

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1    (f)    Zoopraxis Film Assets LLC ("Zoopraxis"), a Delaware limited
2 liability company;

3    (g)    Capco U.S. Film Holdings LLC ("CUSFH"), a Delaware limited
4 liability company;

5    (h)    Capco TF Holdings LLC ("Capco/TF"), a Delaware limited
6 liability company;

7    (i)    TF Acquisition Corporation ("TFA"), a Delaware corporation;

8    (j)    TF Canada Acquisition Corporation ("TF Canada"), a
9 corporation organized under the laws of Ontario, Canada;

10    (k)    Stopping Power Productions LLC, a Delaware limited liability
11 company;

12    (l)    BLAC LLC, a Delaware limited liability company;

13    (m)    Sheridan Square Entertainment Inc., a Delaware corporation;

14    (n)    SSE Guaranty Company, a Delaware corporation;

15    (o)    BT Music LLC, a Delaware limited liability company;

16    (p)    Capitol Films Partners Limited, a private limited company
17 registered under the laws of England and Wales;

18    (q)    Sandfairy Productions Limited, a private limited company
19 registered under the laws of England and Wales;

20    (r)    Sandfairy Merchandising Limited, a private limited company
21 registered under the laws of England and Wales;

22    (s)    Harmony Productions (UK) Limited, a private limited company
23 registered under the laws of England and Wales;

24    (t)    Beautiful Films Limited, a private limited company registered
25 under the laws of England and Wales;

26    (u)    Reel Lucky Limited, a private limited company registered under
27 the laws of England and Wales;

Mitchell Silberberg & Knupp LLP
2961239.2

28

6
SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1      (v)    Bordertown Productions Inc., a California corporation;

2      (w)    Bordertown Productions LLC, a Delaware limited liability

3   company;

4      (x)    Psammead Productions (IOM) Limited, a limited company

5   organized under the laws of the Isle of Man;

6      (y)    Lake Productions Inc., a California corporation;

7      (z)    Lake Distribution Inc., a California corporation;

8      (aa)   Dead Fish Distribution Inc., a California corporation;

9      (bb)   Chaos Distribution Inc., a California corporation;

10     (cc)   Mobius .45 Productions LLC, a Delaware limited liability

11  company;

12     (dd)   Mobyprod 06 Inc., a Delaware corporation;

13     (ee)   Wendell Productions Inc., a California corporation;

14     (ff)   Wendell Distribution Inc., a California corporation;

15     (gg)   NM Productions LLC, a Delaware limited liability company;

16     (hh)   Production Management Services LLC, a Delaware limited

17  liability company;

18     (ii)   Capitol Films U.S. LLC, a Delaware limited liability company;

19     (jj)   Capitol Films Production LLC, a Delaware limited liability

20  company;

21     (kk)   Reel Transit Investments LLC, a Louisiana limited liability

22  company;

23     (ll)   Reel Transit Productions LLC, a Louisiana limited liability

24  company;

25     (mm) Capitol Films Production Limited, a private limited company

26  registered under the laws of England and Wales;

27     (nn)   Reel Dusty LLC, a California limited liability company;

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

7

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1      (oo)  Reel Snowy LLC, a California limited liability company;

2      (pp)  Reel Devilish Ltd., a private limited company registered under

3  the laws of England and Wales;

4      (qq)  Reel Transit LLC, a Nevada limited liability company;

5      (rr)  Reely Good Times Limited, a private limited company registered

6  under the laws of England and Wales;

7      (ss)  TF Canadian Library Holding LLC, a Delaware limited liability

8  company;

9      (tt)  TF Canada Services Corporation, an Ontario, Canada

10  corporation;

11      (uu)  FOTP Productions Inc., an Ontario, Canada corporation;

12      (vv)  Five Dollar Productions LLC, a Delaware limited liability

13  company;

14      (ww) Reel Clandestine LLC, a Nevada limited liability company;

15      (xx)  Fade Out Productions LLC, a Delaware limited liability

16  company;

17      (yy)  TBT Productions LLC, a Delaware limited liability company;

18      (zz)  Clairvoyant Productions Inc., a California corporation;

19      (aaa) The Last Word Movie LLC, a Delaware limited liability

20  company;

21      (bbb) Scheherezade Films Limited, a private limited company

22  registered under the laws of England and Wales;

23      (ccc) Reel Mary Limited, a private limited company registered under

24  the laws of England and Wales;

25      (ddd) Reel Mary Productions Limited, a private limited company

26  registered under the laws of England and Wales;

27

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

8

1          (eee)  Chaotic Films UK Limited, a private limited company registered

2    under the laws of England and Wales;

3          (fff)   Chaotic Productions Ltd., a British Columbia, Canada

4    corporation;

5          (ggg)  Lavender Productions LLC, a Delaware limited liability

6    company;

7          (hhh)  Cerulean Productions LLC, a Delaware limited liability

8    company; and

9          (iii)   Library Asset Acquisition Company Ltd. ("LAAC"), a company

10   organized under the laws of England and Wales.

11        5.     In addition to the foregoing Plaintiffs, six other potential plaintiffs, all

12   of whom were borrowers, guarantors and/or provided collateral to secure the loans

13   which are the subject of this suit, are involved in bankruptcy-related proceedings in

14   the United States and England.  Five of those potential plaintiffs, R2D2 LLC

15   ("R2D2"), a California limited liability company; CT1 Holdings LLC ("CT1"), a

16   Delaware limited liability company; Capco Group LLC ("Capco"), a Delaware

17   limited company; Capital Film Development LLC ("CFD"), a California limited

18   liability company; and ThinkFilm LLC ("ThinkFilm"), a Delaware limited

19   company, had involuntary bankruptcy petitions filed against them on or about

20   March 31, 2010, and an interim trustee was appointed by the Bankruptcy Court in

21   connection with those pending bankruptcy matters.  While R2D2, CT1, and Capco

22   oppose the involuntary petitions and submit that they should be allowed to control

23   the alleged debtors and their assets and claims, the interim trustee contends that he

24   holds all claims belonging to those alleged debtors, as well as those belonging to

25   CFD and ThinkFilm (which do not oppose the involuntary petitions filed as to

26   them), including claims that could have been asserted by and on behalf of alleged

27   debtors as part of this action.  On or about July 20, 2010, the Bankruptcy Court

1   issued an order giving the interim trustee authority over such matters, therefore
2   making it impossible for R2D2, CT1, Capco, CFD and ThinkFilm to join in this
3   case brought by others injured by defendants' wrongdoing at this time. If and when
4   the foregoing insolvency proceedings are dismissed, R2D2, CT1, and Capco will
5   seek leave of court to allow those entities to join in this action. Another potential
6   plaintiff, Capitol Films Limited ("CFL"), is in administration in the United
7   Kingdom, where it was organized. Plaintiffs herein are informed and believe that
8   administration proceedings in the United Kingdom, like bankruptcy proceedings in
9   the United States, give control over CFL's claims and assets to the administrator in
10  those proceedings and prevent the owners from bringing this action on its behalf. If
11  and when the foregoing administration proceedings are dismissed or resolved, or
12  permission is given to pursue these claims on behalf of CFL, CFL will seek leave of
13  court to allow CFL to join in this action.

14          6.      Plaintiffs are informed and believe and on that basis allege that Daniel
15  Bernard Zwirn is an individual, residing in New York, and is or was an officer or
16  principal of certain defendant entities.

17          7.      Plaintiffs are informed and believe and on that basis allege that
18  Steven Campbell is an individual, residing in New York, and is or was an officer or
19  principal of certain defendant entities.

20          8.      Plaintiffs are informed and believe and on that basis allege that:
21  (a) defendant D.B. Zwirn Special Opportunities Fund LLC ("DBZ") is a Delaware
22  limited liability company and until sometime in early to mid 2009, was or operated a
23  hedge fund; (b) at all times relevant hereto, DBZ did business within the County of
24  Los Angeles and State of California; and (c) some or all of the acts, false statements,
25  misrepresentations and omissions committed by DBZ alleged herein took place in
26  whole or in part in Los Angeles County and the State of California. Plaintiffs are
27
28

10

1    informed and believe and on that basis alleged that DBZ is now known as Fortress
2    Value Recovery Fund I LLC.
3        9.      Plaintiffs are informed and believe and on that basis allege that: (a)
4    Defendant Bernard National Loan Investors Ltd. ("BNL") is a Cayman Islands
5    limited liability corporation and is or operates a hedge fund; (b) at all times relevant
6    hereto, BNL did business within the County of Los Angeles and State of California,
7    though it is not and was never authorized to do so; and (c) some or all of the acts,
8    false statements, misrepresentations and omissions committed by BNL alleged
9    herein took place in whole or in part in Los Angeles County and the State of
10   California.
11       10.     Plaintiffs are informed and believe and on that basis allege that: (a)
12   Defendant Hemlock (Lux) S.a.r.l. ("Hemlock") is a Luxembourg limited liability
13   company and is or operates a hedge fund or other investment entity; (b) at all times
14   relevant hereto, Hemlock did business within the County of Los Angeles and State
15   of California, though it is not and was never authorized to do so; and (c) some or all
16   of the acts, false statements, misrepresentations and omissions committed by
17   Hemlock alleged herein took place in whole or in part in Los Angeles County and
18   the State of California.
19       11.     Plaintiffs are informed and believe and on that basis allege that: (a)
20   Defendant D.B. Zwirn & Co. L.P. ("DBZLP") is a limited partnership organized
21   under the laws of Delaware, with its principal place of business in New York; (b)
22   until approximately June 2009, DBZLP managed various hedge funds and other
23   investment entities, including DBZ, BNL and Hemlock, and (c) until approximately
24   June 2009, DBZLP acted on behalf of, as agent for, and/or jointly with each of
25   DBZ, BNL and Hemlock in participating in each of the acts, false statements,
26   misrepresentations, omissions and wrongs alleged herein.  Plaintiffs are further
27   informed and believe and based thereon allege that DBZLP has directly or indirectly

Mitchell
Silberberg &
Knupp LLP

2961239.2

11

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

28

1   received a portion of the unlawful and usurious interest charged to and paid by

2   Plaintiffs and borrowers as alleged herein.

3       12.     Plaintiffs are informed and believe and on that basis allege that

4   Defendant Fortress is a limited liability company organized under the laws of

5   Delaware, with its principal place of business in New York.  Plaintiffs are informed

6   and believe and based thereon alleged that, in or about June 1, 2009, by agreement

7   or assignment, Fortress became the successor in interest to DBZLP as manager of

8   each of DBZ, BNL and Hemlock, and thereafter acted on behalf of, as agent for,

9   and/or jointly with each of those entities in participating in and/or ratifying each of

10  the acts, false statements, misrepresentations, omissions and wrongs alleged herein.

11  Plaintiffs are informed and believe, and on that basis allege that Fortress has directly

12  or indirectly received a portion of the unlawful and usurious interest charged to and

13  paid by Plaintiffs and borrowers alleged herein.  Plaintiffs are informed and believe,

14  and on that basis allege that, in or after June 1, 2009, Fortress caused DBZ to be

15  renamed Fortress Value Recovery Fund I LLC ("FVRF").  Plaintiffs are informed

16  and believe, and on that basis allege, that:  (a) at all times relevant hereto, Fortress

17  did business within the County of Los Angeles and State of California; and (b) some

18  or all of the acts, false statements, misrepresentations and omissions committed

19  and/or ratified by Fortress or for which it is responsible as successor to DBZLP as

20  alleged herein took place in whole or in part in Los Angeles County and the State of

21  California.

22      13.     The true names and capacities, whether individual, corporate,

23  associate or otherwise of the defendants sued herein as Does 1 through 100,

24  inclusive, are unknown to Plaintiffs, and said defendants are therefore sued under

25  such fictitious names.  Plaintiffs are informed and believe and on that basis allege

26  that Does 1 through 100 inclusive are obligated to Plaintiffs as set forth herein,

27  participated in and/or ratified the acts, omissions and wrongs alleged herein, and are

28

Mitchell
Silberberg &
Knupp LLP
2961239.2

12

1   responsible, in whole or in part, for the damages suffered by Plaintiffs. Plaintiffs

2   will amend this complaint to state the true names and capacities of said fictitiously

3   named defendants when ascertained.

4        14.     Plaintiffs are informed and believe and on that basis allege that each

5   defendant mentioned herein was the agent and employee of each of the other

6   defendants mentioned herein, and in acting or failing to act as alleged herein, acted

7   within the scope of his/her/its authority.

8        15.     Plaintiffs Tutor and Bergstein have entered into one or more

9   agreements with DBZ, BNL and Hemlock purportedly providing that certain claims

10   between and among them only, and not claims of or against other parties, will be

11   referred to a referee pursuant to California Code of Civil Procedure Section 668. In

12   D.B. Zwirn Special Opportunities Fund v. Bergstein, L.A.S.C. Case

13   No. BC 425 112, Tutor and Bergstein have raised certain counterclaims which

14   overlap some of the claims asserted here. Over Tutor's and Bergstein's objections,

15   those counterclaims have been referred to Referee Richard H. Chernick, along with

16   the claims asserted in the Complaint in that same action.

17                               **GENERAL ALLEGATIONS**

18        16.     The majority of Plaintiffs are subsidiaries and affiliates of CT1. CT1

19   is owned by R2D2. CT1 and its subsidiaries and affiliates have financed, produced,

20   and/or distributed over 1,300 films. Among the wide range and genres of motion

21   pictures that have been at various times financed, produced or distributed by CT1

22   and its subsidiaries and affiliates since at least 2005 are the critically-acclaimed

23   Robert Altman films *Gosford Park, Prairie Home Companion*, and *The Company;*

24   *Adaptation*, starring Meryl Streep, Nicolas Cage and Chris Cooper, which won

25   Golden Globe and Academy Awards; Jennifer Lopez' *The Wedding Planner* and

26   *Bordertown*; action films such as *Point Break* and *Terminator 3*; and thrillers such

27   as *Lucky No. Slevin* and *Spartan*.

Mitchell
Silberberg &
Knupp LLP

2961239.2

28

13

1       17.     In order to make, acquire, and distribute motion pictures, CT1 and its

2    subsidiaries and affiliates have needed and obtained financing from third party

3    lenders.  The procurement of third party financing is standard practice in the motion

4    picture industry and is the primary way both independent film companies and large

5    studios obtain the necessary capital for their production and distribution operations.

6    CT1 and its subsidiaries and affiliates (and motion picture companies in general)

7    must continually obtain financing in order to operate.  In essence, this financing is

8    product financing, akin to financing which manufacturing companies obtain to

9    finance their production and distribution operations.

10       18.     In the motion picture industry, different types of financing may be

11    procured.  Sometimes, financing is obtained on a "single picture" basis, where a

12    lender provides a loan for the specific purpose of making, acquiring and/or

13    distributing a particular film ("Single Picture Financing" or "Single Picture Loans").

14    Sometimes financing is needed to acquire companies involved in making, acquiring

15    and distributing multiple motion pictures, or entire film libraries ("Acquisition

16    Financing").  Sometimes, financing is used on a "revolving credit line" basis, where

17    a lender provides a large revolving credit line to a company which makes or

18    distributes films, which the company can then use according to its particular needs

19    as permitted by the terms of the credit line (known as a "Revolver").  Sometimes

20    lenders provide short term financing where the borrower needs more time to clean

21    up a targeted film project acquisition or to document the terms of a longer term

22    financing deal ("Bridge Financing" or "Bridge Loans").  This case involves each of

23    these four types of loans – Single Picture Financing, Acquisition Financing, a

24    Revolver, and Bridge Financing.

25                    **The Transition of Capitol's Financing to DBZ**

26       19.     CFG is a subsidiary of Capco, and Capco is a subsidiary of CT1.

27    From its inception and through approximately the first quarter of 2007, CFG and its

Mitchell
Silberberg &
Knupp LLP

2961239.2

28

14

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1    subsidiaries and affiliates made and/or distributed over 50 films, each financed

2    through Single Picture Financing.  None of these Single Picture Loans was provided

3    by DBZ.  Instead, CFG procured such Single Picture Loans from Union Bank,

4    Comerica Bank, and Allied Irish Bank.  Each and every one of those Single Picture

5    Loans was paid back in full and on the agreed terms.  During the three years prior to

6    and including 2007, the average annual interest rate on those Single Picture Loans

7    was approximately 7% per annum.

8         20.    During the period from about December 2005 until the last quarter of

9    2007, CFG also had a $100 million revolving credit line facility with Allied Irish

10   Bank (the "AIB Line").  The AIB Line was structured to provide separate Single

11   Picture Loans to CFG which were extended based on a pre-agreed set of conditions.

12   The interest rate on the AIB Line adjusted according to the London Inter-bank

13   Offered Rate (LIBOR), and averaged less than 6% per annum during the period.

14        21.    In or about December 2005, CFG entered into its first loan transaction

15   with defendants whereby DBZ, BNL and Hemlock provided Acquisition Financing

16   and certain Bridge Loans for various transactions.  Specifically, in or about January

17   2006, CFG acquired the stock of CFL.  Financing for that acquisition was provided

18   through a January 20, 2006 loan made by DBZ, BNL and Hemlock to CFG, Capitol

19   Films Partners Limited and CFL in the principal amount of $23,157,895 (the

20   "Capitol Loan").  The Capitol Loan bore interest at a stated rate of 18% per annum,

21   and, in addition, imposed additional interest disguised as loan "costs" such as a 5%

22   ($1,157,894.75) "closing fee," and a $90,000 per year "asset management fee" paid

23   to DBZ, BNL and/or Hemlock.

24        22.    At or about the time of the Capitol Loan, CFG and a number of

25   entities which were subsidiaries or affiliates of CFG (including CFL, Capitol Films

26   Partners Limited, Sandfairy Productions Limited, Sandfairy Merchandising Limited,

27   Harmony Productions (UK) Limited, Beautiful Films Limited, Reel Lucky Limited,

28

Mitchell
Silberberg &
Knupp LLP
2961239.2

15

1   Bordertown Productions Inc., Bordertown Productions LLC, Reel Dusty LLC, Reel
2   Snowy LLC, Psammead Productions (IOM) Limited, Lake Productions Inc., Lake
3   Distribution Inc., Dead Fish Distribution Inc., Chaos Distribution Inc., Mobius .45
4   Productions LLC, Mobyprod 06 Inc., Wendell Productions Inc. and Wendell
5   Distribution Inc.), each guarantied and/or pledged or granted security interests in
6   certain assets, including approximately 100 films, to secure the Capitol Loan. In
7   addition, David Bergstein executed a personal guaranty of the Capitol Loan at or
8   about the time it was made. The Capitol Loan had a maturity date of January 2009.
9   Under the terms of the Capitol Loan, interest payments were due monthly and
10  principal payments were due on a quarterly basis. Up until at least the end of 2007,
11  all principal and interest payments due under the Capitol Loan were paid by and on
12  behalf of CFG, Capitol Films Partners Limited and Capital Films Limited. Indeed,
13  internal DBZ documents reflect that, as of November 2007, approximately $3.5
14  million in principal as well as all interest due in connection with the Capitol Loan
15  had been paid. DBZ has refused, despite repeated demands, to provide an
16  accounting as to all sums, principal and interest, received by it on the Capitol Loan
17  and other loans alleged herein. Millions of dollars in interest, fees and other charges
18  were paid to or received by defendants in connection with the Capitol Loan.

19        23.      Shortly after the Capitol Loan closed, defendants provided a total of
20  $9.6 million funded in five Single Picture Loans to replace already existing
21  financing that had been provided by Comerica Bank on four films: *.45, The Wendell*
22  *Baker Story, Bordertown* and *Chaos* (the "Individual Capitol Loans"). The
23  Individual Capitol Loans extended by defendants to various CT1 subsidiaries and
24  affiliates had an average annual interest rate (after including points) in excess of
25  20% per annum. Defendants were paid in full in connection with the Individual
26  Capitol Loans, including all usurious interest thereunder, as discussed in greater
27  detail below. Defendants have refused, despite repeated demand, to provide an

Mitchell
Silberberg &
Knupp LLP   28
2961239.2

16

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1   accounting as to all sums, principal and interest, received by it on the Individual
2   Capitol Loans and other loans alleged herein.  Millions of dollars in interest, fees
3   and other charges were paid to or received by defendants in connection with the
4   Individual Capitol Loans.

**The ThinkFilm Loans**

6       24.       On or about October 19, 2006, and as amended in March, April, and
7   May 2007, DBZ, BNL and a related entity, Bernard National Senior Funding Ltd.,
8   loaned a total of approximately $45 million to ThinkFilm, FPLAC and Zoopraxis,
9   primarily so that CT1 could through various subsidiaries and affiliates indirectly
10  acquire ThinkFilm and certain other film assets (hereafter, the "ThinkFilm Loans").
11  The ThinkFilm Loans were made in three tranches.  Tranches A and C totaled
12  approximately $40.5 million, and bore interest at LIBOR increased by an amount
13  sufficient to account for any foreign currency reserve requirements, plus 8% per
14  annum; Tranche B was $4.5 million and bore interest at LIBOR increased by an
15  amount sufficient to account for any foreign reserve requirements, plus 6% per
16  annum.

17      25.       At the time the ThinkFilm Loans were made, LIBOR stood at 5.32%.
18  Accordingly, the interest rate on Tranche A was not less than 13.32%, and the
19  interest rate on Tranche B was not less than 11.32%.  ThinkFilm, FPLAC and
20  Zoopraxis were required to grant the lenders security interests in all their assets in
21  connection with the ThinkFilm Loans.  In addition, DBZ and BNL required that
22  Capitol Films Limited, Capitol Films Partners Limited, CFG, CUSFH, Capco/TF,
23  CT1, CFA, TFA, TF Canada, and Bergstein execute guaranties of the ThinkFilm
24  Loans.  The ThinkFilm Loans had a maturity date of July 2008.

25      26.       Millions of dollars in interest, fees and other charges were paid to or
26  received by defendants in connection with the Think Film Loans.

27

17

**The Sheridan Square Transactions**

27.     In or about late November 2006 ("Sheridan Initiation Date"), Steve
Campbell and Eileen Burke, both of whom were employed by and/or agents of DBZ
and DBZLP, approached David Bergstein, and solicited Plaintiffs to invest in an
entity -- Sheridan Square Entertainment, Inc. ("Sheridan") -- to which DBZ or
another entity affiliated with DBZLP had loaned monies. Sheridan was in the
business of promoting music artists and selling music catalog rights, an area outside
the normal business of Plaintiffs.  Plaintiffs had no prior dealings with or knowledge
of Sheridan.

28.     At the time of and following the Sheridan Initiation Date and
continuing through at least March 2008, Burke and Campbell, both of whom were
employed by and/or agents of DBZ and DBZLP, represented to David Bergstein in
numerous phone calls and emails, among other things, that:  (a) Sheridan was a
music distribution and publishing company worth over $54 million; (b) it had a
marketable music catalog (and other assets); and (c) the investment that DBZ and
DBZLP requested of Plaintiffs would be of minimal risk, and profitable to Plaintiffs.
At such times, Burke and Campbell also provided Bergstein with purported
valuations of Sheridan's assets to support their representations, including those
contained in a report prepared by DBZ and/or DBZLP dated July 5, 2006.  Burke
and Campbell also made it clear to Bergstein and Tutor that DBZ and DBZLP
considered the proposed investment in Sheridan to be an accommodation to which
Plaintiffs needed to agree, and that such investment would be an important factor in
DBZ's and DBZLP's willingness to provide additional film financing to Plaintiffs,
do additional business with Plaintiffs, and follow through with a plan to provide a
Revolver in the coming year (as described further below.)

29.     Plaintiffs are informed and believe and on that basis allege that
several months prior to the Sheridan Initiation Date, DBZ or another entity affiliated

Mitchell
Silberberg &
Knupp LLP
2961239.2

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1   with DBZLP had loaned approximately $25 million to Sheridan (the "Sheridan-DBZ

2   Loan"), the proceeds of which loan were used to repay a $25 million loan that

3   Sheridan had received from Fortress (the "Sheridan-Fortress Loan").  Plaintiffs did

4   not know at the time, but subsequently learned, that Fortress had demanded that

5   DBZ and/or DBZLP agree to pay off the Sheridan-Fortress Loan as an

6   accommodation to Fortress, so that DBZ and DBZLP could participate in other

7   business with Fortress.  Plaintiffs are informed and believe and on that basis allege

8   that DBZ or another entity affiliated with DBZLP also obtained an equity interest in

9   Sheridan at the time that DBZ or another entity affiliated with DBZLP made the

10  Sheridan-DBZ Loan.

11          30.      In reliance on the representations described in above, and because

12  Plaintiffs felt compelled to acquiesce in defendants' demand in order to obtain

13  critical financing, in or about February 2007, Plaintiffs agreed to loan Sheridan

14  monies, invest in Sheridan, and provide certain guarantees to defendants as to other

15  Sheridan loans.  The investments, loans, and guarantees were made by Plaintiffs

16  SSE Guaranty Company, BT Music LLC, CT1, Tutor and Bergstein.

17          31.      Initially, at the time of the Sheridan Initiation Date, all that was

18  required of Plaintiffs was that they provide approximately $4 million equity

19  investments financed by loans from DBZ.  Plaintiffs did in fact make that

20  investment and those loans, and were led to believe that was all that would be

21  required of them.  As time went on, DBZ and DBZLP made repeated demands that

22  Plaintiffs make further investments in Sheridan, each time representing that it was

23  the last time that such a demand would be made.  By March 2008, Plaintiffs had

24  been required to invest over $10 million in cash and other assets and provide

25  guaranties of over $30 million as to Sheridan.

26          32.      Subsequently, after March 2008, Plaintiffs learned that the Sheridan

27  Assets were in fact not worth $54 million, and that defendants and their agents had

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1  misrepresented and concealed the true facts about Sheridan and the Sheridan Assets

2  throughout the time that they induced Plaintiffs to continue to invest and/or take out

3  loans relating to Sheridan.  Indeed, after March 2008, Plaintiffs learned that the

4  highest valuation for the Sheridan Assets put their gross value at less than

5  $17 million, before taking into account any liabilities or other offsets, which further

6  reduced their net value to less than $5 million.

7  <u>**Negotiations Regarding the $250 Million Revolver and the**</u>

8  <u>**Consolidation of Loans Into the CT1 Loan**</u>

9    33.  In or about June 2007, DBZ, BNL, DBZLP and Plaintiffs began

10  negotiations in earnest over a potential $250 to $300 million Revolver that DBZ,

11  DBZLP and BNL represented they would provide to Plaintiffs.  At that time,

12  Plaintiffs collectively owed approximately $75 million in total to defendants, and

13  separately had a $4 million obligation as to Sheridan.  Between June 2007 and

14  March 2008, Daniel B. Zwirn, Eileen Burke, Steve Campbell, Mike Smith, Eric

15  Nadzo, Charlene Biala and Margaret Chu of DBZ, BNL and DBZLP repeatedly told

16  Bergstein and other of Plaintiffs' representatives that a $250 to $300 million credit

17  facility would be extended to CT1 and its subsidiaries and affiliates, which funds

18  could be used to consolidate existing indebtedness (including the DBZ loans), to

19  make, acquire and distribute films and film libraries, and to provide operating

20  capital to all CT1 subsidiaries and affiliates.  Steve Campbell, Eileen Burke, and

21  Steve Fayne of Akin Gump representing DBZ, BNL and DBZLP, and Bergstein,

22  Allen Lee, Susan Tregub, Michael Barnes, Tony Young, Hannah Leader, and

23  Richard Suhl, on behalf of Plaintiffs, negotiated the terms of such a credit facility

24  from June 2007 until March 2008 through many extensive phone conferences,

25  emails, and in-person meetings.

26    34.  During the many months during which the Revolver was being

27  negotiated, beginning in June 2007, Campbell and Burke instructed Bergstein that

28

Mitchell
Silberberg &
Knupp LLP
2961239.2

20

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1    CT1 and its subsidiaries and affiliates were not to obtain any further Single Picture
2    Loans from third parties (including from the AIB Line) and that any and all
3    financing was to be obtained only from DBZ and/or BNL in the form of Bridge
4    Loans.  Since it was critical for CT1 and its subsidiaries and affiliates to continue to
5    obtain financing for individual films in order to meet its obligations to third parties,
6    this condition had a significant impact on CT1 and its subsidiaries and affiliates.
7    Among other things, it meant that CT1 and its subsidiaries and affiliates would be
8    required to pay significantly higher interest (by multiples of 3 to 5 times the normal
9    rate) to procure individual film financing during this interim period.  As a
10   consequence of DBZ's, BNL's and DBZLP's requirements and conditions for
11   negotiating the Revolver, CT1 and its subsidiaries and affiliates became completely
12   dependent on DBZ, BNL and DBZLP for financing.

13          35.     One such loan entered into during this time frame was the Single
14   Picture Loan for a motion picture entitled "Black Water Transit."  On or about June
15   22, 2007, single purpose entity Reel Transit LLC entered into a loan agreement with
16   lenders DBZ and BNL, and Aramid Entertainment Funding Ltd. (the "BWT Loan").
17   This loan had an interest rate in excess of 24% per annum, including points and fees.

18          36.     As of September of 2007, there were nine loans outstanding between
19   Plaintiffs and DBZ, BNL and Hemlock (including the ThinkFilm Loans and the
20   Capitol Loan) for a total balance (including usurious interest) of less than $75.3
21   million (the "9 Loans").  In addition, there was a total of $4 million which Plaintiffs
22   had invested or loaned to Sheridan.  As part of and a condition to the ongoing
23   negotiations of the Revolver, DBZ, BNL and Hemlock demanded that CT1 and its
24   subsidiaries and affiliates refinance the 9 Loans into a single loan and that Ronald
25   Tutor provide a personal guarantee of the new loan.  Up to that point in time, none
26   of the 9 Loans had personal guarantees from Tutor.  At that time, all of the 9 Loans
27   were in compliance and there were no defaults.  The Capitol Loan was not due to

Mitchell
Silberberg &
Knupp LLP          28                                        21
2961239.2

1  mature until January 2009, and the ThinkFilm Loans were not due to mature until

2  July of 2008.  Accordingly, Plaintiffs questioned the need for refinancing the

3  9 Loans.

4       37.       Campbell and Burke repeatedly told Bergstein that the refinancing

5  and amendment of the 9 Loans was a necessary predicate step in order for DBZ,

6  BNL and DBZLP to provide the promised Revolver, which Plaintiffs needed and

7  were counting on to run their businesses.  Specifically, Campbell and Burke told

8  Bergstein, among other things, that, in order for the Revolver to be provided DBZ,

9  BNL, and DBZLP required that:

10          (a)     Bergstein and Tutor guarantee all of the loans which they had not

11       previously guarantied, and provide a "Limited Guaranty and Keepwell

12       Agreement" relating to loans previously made to Sheridan;

13          (b)     Plaintiffs amend the existing 9 Loans, adding obligors, adding

14       and changing collateral, raising interest rates, and imposing various charges

15       and fees;

16          (c)     Plaintiffs shift film assets from one company to another to meet

17       DBZ's, BNL's and Hemlock's internal needs to justify the financing; and

18          (d)     Plaintiffs primarily use the proceeds from the higher rate new

19       loan to pay off and reduce existing non-guarantied loans although such loans

20       had lower interest rates, were in compliance and had not yet matured.

21       38.       Between the period November 2007 and March 2008, Plaintiffs

22  compromised and agreed to refinance certain of the 9 Loans and provide certain of

23  the guaranties which DBZ, BNL and Hemlock demanded.  Ultimately, the parties

24  agreed to reduce the 9 Loans to four loans.  Of these four loans, two were part of the

25  original 9 Loans, and two were new loans.  The old loans were the ThinkFilm Loans

26  and the Capitol Loan, and the two new loans were the CT1 Loan and the Stopping

27  Power Loan, discussed in greater length below.  The other loans making up the 9

1    Loans were paid off through proceeds from the CT1 Loan.  In addition, the Capitol

2    Loan was reduced by proceeds from the CT1 Loan, and its terms, and the terms of

3    the ThinkFilm Loans, were modified by certain amendments, which specifically

4    included providing Tutor guaranties where no such guaranties previously had

5    existed, raising interest rates, and providing for early pay offs of portions of the

6    loans.

7         39.    Moreover, the terms of the Capitol Loan and the ThinkFilm Loans, as

8    amended, provided for many additional controls and security in favor of DBZ, BNL

9    and Hemlock.  This included purported "blanket liens" on all existing collateral

10   (including all films) held by Plaintiffs and "after acquired asset" language which

11   provided that DBZ, BNL and Hemlock would be granted a lien on any new assets

12   that the Plaintiffs might obtain.  DBZ, BNL and Hemlock were given significant

13   control over all business of CT1 and its subsidiaries and affiliates, including

14   approval rights as to any financing which CT1 and its subsidiaries and affiliates

15   could obtain on any existing or new assets.  DBZ, BNL and Hemlock also had the

16   right to approve any financing which CT1 and its subsidiaries and affiliates could

17   obtain to finance the production of new movies.  The survival of CT1 and its

18   subsidiaries and affiliates was wholly dependent on the financing of new

19   productions, and historically CT1 and its subsidiaries and affiliates obtained their

20   Single Picture Financing from lenders other than DBZ and BNL (Comerica, Allied

21   Irish Bank and others) at annualized rates of less than 7%.

22        40.    The CT1 Loan and the Stopping Power Loan were new loans made in

23   November and December of 2007, used primarily to pay off certain of the 9 Loans,

24   a portion of the Capitol Loan, to make unrelated payments to DBZ and BNL with

25   regard to the film *Air I Breathe*, and they provided for new "fees," higher interest

26   rates, and "interest reserves" to be paid to DBZ and BNL.  In addition Tutor and

27

28

1   other Plaintiffs were required to guaranty the new loans and the DBZ-Sheridan

2   Loan.

3        41.     The "Stopping Power Loan" contained particularly egregious terms.

4   In November of 2007, DBZ and BNL made the Stopping Power Loan to Stopping

5   Power Productions LLC, loaning it the amount of $11.7 million (later raised to

6   $16.2 million), which bore interest at 16% per annum, and required the payment of

7   an upfront "transactional fee" of 10% of the overall amount of the transaction. This

8   transaction yielded DBZ and BNL a total overall annualized interest rate of 43.5%

9   per annum based on the maturity date of the loan. Of the initial proceeds, nearly

10  60% was retained by DBZ and BNL for fees and interest, including a $1.17 million

11  "transactional fee." DBZ and BNL required that this loan be personally guarantied

12  by Plaintiffs, including Bergstein and Tutor.

13       42.     In December 2007, DBZ and BNL entered into the CT1 Loan

14  transaction with Plaintiffs, which loan amount was initially $40 million (later raised

15  to $51 million), bearing interest at LIBOR, increased by an amount sufficient to

16  account for any foreign reserve requirements, plus 6% per annum. As of the date

17  the CT1 Loan was made, LIBOR stood at 5.02%, and the interest rate on the CT1

18  Loan was 11.02% per annum. In addition, Bergstein and Tutor were required to

19  guaranty the DBZ-Sheridan loans as part of this transaction. The CTI loan and

20  Sheridan guaranty were represented by DBZ and BNL to be necessary parts of the

21  interim loan arrangements that would ultimately lead to and be superseded by the

22  $250 million Revolver. DBZ and BNL required that the CT1 loan be collateralized

23  by the assets of many of the Plaintiffs, and that it also be guarantied by a number of

24  Plaintiffs, including Bergstein and Tutor. At least the following entities, besides

25  CT1, Bergstein and Tutor, were obligors, guarantors, or provided collateral to secure

26  the CT1 Loan: Capco, NM Productions LLC, Production Management Services

27  LLC, Capitol Films U.S. LLC, Capitol Films Production LLC, Capitol Films

28

24

1 | Development LLC, Reel Transit Investments LLC, Reel Transit Productions LLC,
2 | Capitol Films Limited, Sandfairy Productions Limited, Psammed Productions
3 | (IOM) Limited, Beautiful Films Limited, Reel Lucky Limited, Sandfairy
4 | Merchandising Limited, Capitol Films Production Limited, Harmony Productions
5 | (UK) Limited, Reel Dusty LLC, Reel Snowy LLC, Reel Devilish LLC, Reel Transit
6 | LLC, Reely Good Times Limited, Mobprod 06 Inc., Mobius .45 Productions LLC,
7 | Bordertown Productions LLC, Bordertown Productions Inc., Wendell Productions
8 | Inc., Wendell Distribution Inc., Lake Productions Inc., Lake Distribution Inc., Dead
9 | Fish Distribution Inc., Chaos Distribution Inc., CFG, Capitol Film Partners Limited,
10 | CUSFH, Capco/TF, TF Canadian Library Holdings LLC, TF Canada Acquisition
11 | Corporation, TF Canada Services Corporation, ThinkFilm, FOTP Productions Inc.,
12 | Five Dollar Productions LLC, Reel Clandestine LLC, Fade Out Productions LLC,
13 | TBT Productions LLC, Clairvoyant Productions Inc., The Last Word Movie LLC,
14 | Scheherezade Films Limited, Reel Mary Limited, Reel Mary Productions Limited,
15 | CFA, Zoopraxis, FPLAC, Chaotic Films UK Limited, Chaotic Productions Ltd.,
16 | Lavender Productions LLC, Cerulean Productions LLC, and BLAC LLC.

17 |     43.    DBZ and BNL also required that nearly $27 million of the CT1 Loan
18 | initial proceeds be used to refinance existing un-guarantied obligations of Plaintiffs,
19 | thereby effectively causing those obligations to be guarantied, as well as increasing
20 | the collateral for said borrowed funds. Of that $27 million, approximately $8.5
21 | million was required to be used to pay down the Capitol Loan, which was not in
22 | default and did not mature for more than another year; approximately $6.7 million
23 | was required to be used to pay off DBZ and BNL on unguarantied Single Picture
24 | Loans made to various CT1 subsidiaries and affiliates; another $2.9 million was
25 | required to be used by BLAC LLC to "purchase" loans made by DBZ and BNL in
26 | connection with a movie known as *The Wendell Baker Story*; another $2.7 million
27 | was required to be used to pay DBZ and BNL unrelated minimum guaranties due on

Mitchell
Silberberg &
Knupp LLP

2961239.2

28

25

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1   a motion picture called *The Air I Breath*; and another $6.45 million was required to

2   be paid to defendants to reduce loans related to Sheridan Square. DBZ and BNL

3   also required that approximately $6.4 million of the loan proceeds be paid to them

4   as loan fees, legal costs and to establish an interest reserve.

5        44.     By the end of 2007, the parties had agreed on the terms for the

6   Revolver, which provided for an average annualized interest rate of 8%. It was in

7   that context that the Plaintiffs agreed to the terms of the CT1 and Stopping Power

8   Loans. The agreement as to the Revolver was memorialized in a document entitled

9   "Capitol Multi-Tranche Facility." Campbell and Burke of DBZ also both

10  acknowledged in writing that by November 30, 2007, the terms of such a facility

11  had been "finalized" between and among said parties.

12       45.     In agreeing to the loans, modifications and guaranties described in

13  paragraphs 33 through 44 above, Plaintiffs reasonably relied on the promises and

14  representations of DBZ, BNL and DBZLP that they would provide the Revolver to

15  CT1 and its subsidiaries and affiliates to enable them to finance their motion picture

16  business.

17       **DBZ's Collapse and Its Impact On Plaintiffs' Business Operations**

18       46.     Beginning in September 2007, DBZ, BNL and DBZLP became

19  increasingly aggressive in making other unreasonable demands on Plaintiffs. For

20  instance, in November 2007, Campbell and Burke began aggressively pushing

21  Bergstein to have Plaintiffs invest in a company called TV Tunes ("TVT") which

22  was engaged in business similar to that of Sheridan. DBZ was an equity holder in

23  TVT, as well as its senior secured creditor. Plaintiffs are informed and believe that

24  the secured obligation from TVT and its subsidiaries to DBZ was in excess of $40

25  million (the "TVT-DBZ Loan"). The TVT-DBZ Loan fell into default. DBZ

26  provided information to Plaintiffs indicating that TVT had a significant equity value

27  and urged Plaintiffs to invest upwards of $10 million in TVT to bring the TVT-DBZ

Mitchell
Silberberg &
Knupp LLP

2961239.2

28

26

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1   Loan out of default.  Plaintiffs ultimately refused to invest money into TVT.  Shortly

2   thereafter, TVT went into bankruptcy, and the assets were sold at only a fraction

3   (15-20%) of the debt owed to DBZ.

4        47.        Long after the various loans were restructured in anticipation of the

5   $250 million Revolver, after negotiations for the $250 million Revolver were

6   concluded, and within the past three years, Bergstein and Plaintiffs began to learn

7   facts that showed many of the representations made by defendants during the

8   negotiations were false and misleading when made, and that DBZ, BNL and DBZLP

9   could not extend the Revolver to Plaintiffs, because, among other things:

10              (a)     When the Revolver was being negotiated and defendants insisted

11       that Plaintiffs enter into the various interim agreements alleged hereinabove,

12       DBZ, BNL and DBZLP did not have, and defendants and their employees and

13       agents knew that they did not have, the ability to fulfill their commitment to

14       provide a $250-300 million Revolver to CT1 and its subsidiaries and

15       affiliates, and merely used that false promise to extract additional loan fees,

16       higher interest rates, other financial concessions, additional collateral and

17       additional guaranties from Plaintiffs;

18              (b)     In September 2006, DBZ's and BNL's parent company/manager,

19       DBZLP, had discovered financial irregularities by one or more of its officers

20       or employees which had resulted in the SEC launching an investigation of

21       DBZ, BNL and DBZLP, which was ongoing throughout 2007, and had hired

22       auditors to review a companywide review, which was not concluded until

23       December 2007;

24              (c)     By late 2006 or early 2007, numerous of DBZ's and BNL's

25       investors were demanding redemptions (because of the ongoing SEC

26       investigation and the fact that DBZ could not produce an audit), and DBZ and

27

28

Mitchell
Silberberg &
Knupp LLP
2961239.2

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

BNL were unable to meet those demands in part because of difficulty in selling investments which were largely illiquid;

    (d)    By January 2007, DBZ, BNL and DBZLP had stopped soliciting or accepting new investments;

    (e)    DBZ or another entity affiliated with DBZLP had become involved with and made loans to Sheridan as an accommodation to Fortress, knowing full well that Fortress's loans to Sheridan were troubled, and in the hope that as a result of bailing Fortress out on Sheridan, Fortress would provide DBZ and DBZLP with other valuable opportunities;

    (f)    Sheridan's assets had nowhere near the value DBZ and DBZLP represented them to have, and its financial condition was far worse than represented;

    (g)    DBZ's and DBZLP's true purpose in inducing Plaintiffs, Bergstein and Tutor to invest in Sheridan through lies and intimidation and later to guaranty part of Sheridan's debts, was to reduce DBZ's exposure to its bad loans to Sheridan; and

    (h)    At least according to a suit filed by certain of defendants' investors, Daniel B. Zwirn improperly diverted tens of millions of dollars of investor funds to his own personal use.

48.    Plaintiffs were not aware of any of the true facts as alleged in paragraph 47 at the time DBZ's representations were made and Plaintiffs acted in reasonable reliance thereon, as alleged in paragraphs 33 through 45 above, and Plaintiffs only discovered the true facts set forth in paragraph 47 after acting in reliance upon defendants misrepresentations and within the past three years.

49.    Only after the Plaintiffs completed the restructuring of the DBZ Loans as described in paragraphs 33 through 45 and within the past three years did it

1    become apparent to Plaintiffs that DBZ, BNL and DBZLP could not and did not

2    intend to fulfill their promises of providing a Revolver.

3          50.      By May of 2008 defendants were erroneously claiming that they held

4    blanket liens on all assets of CT1 and its subsidiaries and affiliates, and were owed

5    an amount in excess of $180 million as a result of the usurious interest, penalties,

6    and fees which defendants claimed were owed. CT1 and its subsidiaries and

7    affiliates contested the calculation, but defendants prevented CT1 and its

8    subsidiaries and affiliates from obtaining Single Picture Loans other than from DBZ

9    or BNL; refused to allow Plaintiffs to buy out, and refused to release, any of the

10   individual assets in which they held security interests, and refused to provide any

11   accounting statements to enable CT1 and its subsidiaries and affiliates to determine

12   which payments had been allocated to principal, interest and/or loan fees.

13   Defendants also consistently refused to respond to requests for loan payoff

14   statements. As a result of defendants' actions, Plaintiffs were unable to properly

15   exploit any of their assets or secure alternative financing.

16         51.      In addition, defendants spoiled the underlying film collateral by either

17   flatly refusing, or failing to respond, to numerous requests made by CT1 and its

18   subsidiaries and affiliates, to subordinate or release defendants' blanket lien on

19   films, so that CT1 and its subsidiaries and affiliates could obtain production loans

20   that would permit them to finish and complete these films. Defendants refused to

21   subordinate or release their claimed liens on, among other films, "Bad Meat" and

22   "Love Ranch," which meant that the Plaintiff production companies for these films

23   were unable to complete and release these films.

24         52.      The unreasonable demands of defendants, defendants' paralysis,

25   defendants' inability and/or refusal to respond to requests for loan payoffs and

26   requests to subordinate or release their liens so that business operations of Plaintiffs

27   could proceed, films could be completed and released, and defendants' failure to

28

29

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1   protect the film collateral, resulted in many employees leaving CT1 and its

2   subsidiaries and affiliates throughout 2008 and 2009; caused production of six

3   motion pictures to be slowed, halted or irretrievably damaged; and caused the value

4   of the film collateral to be substantially impaired.  CT1 and its subsidiaries and

5   affiliates could not finance new films or refinance its operations by bringing in new

6   capital, either in the form of equity or debt, because of defendants' paralysis, but

7   defendants could no longer provide any financing, and were completely incapable of

8   providing the promised $250 million Revolver.

9        53.     Defendants exacerbated their injury of Plaintiffs by, among other

10  things, making threats to CT1 and its subsidiaries and affiliates and their key

11  employees in mid to late 2008 that defendants would likely "shut down" CT1 and its

12  subsidiaries and affiliates.  Such threats were made by, among others, Campbell and

13  Burke to, among others Hannah Leader, Melanie Alshab, and Tony Young.  In mid-

14  2008 to mid-2009, defendants demanded that a series of individuals controlled by

15  defendants be employed by CT1, and report to defendants.  These individuals

16  included, among others, Melanie Alshab, John Zabel, and Bill Shpall.  Despite

17  defendants' insistence that these individuals be hired by CT1 and its affiliates to

18  watch over defendants' interests and gather information so that decisions could be

19  made regarding particular films, defendants continued their practice of permitting

20  film collateral to be spoiled, refusing to respond to or grant requests for

21  subordination or release of liens as to particular films, so that films could be

22  completed and released.

23       54.     By June 2008, no real DBZ/DBZLP operation remained, and Daniel

24  Zwirn was focused on defending himself in a multitude of lawsuits, SEC

25  investigations, and other claims. When Bergstein and Plaintiffs sought loan payoff

26  statements, accountings, or made a request that defendants subordinate or release

27  their liens so that business could be conducted, defendants refused or failed to take

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1   reasonable action, and the only response they received was Daniel Zwirn's cavalier

2   statement: "Sue me, because I have bigger problems." Plaintiffs were held hostage

3   by defendants' state of paralysis for over a year, and as a result, suffered more than

4   $100 million in damages. To this day, defendants, including Fortress, have refused

5   to provide proper accountings as to how interest and principal payments were

6   allocated by defendants, despite multiple demands, and express provisions of the

7   loan agreements requiring them to do so.

8       55.    As to Sheridan, during the period between January 2007 and March

9   2009 when DBZ and/or another entity affiliated with DBZLP ultimately foreclosed

10  on the assets, Plaintiffs estimate that over $20 million that could have otherwise

11  been used to reduce loans made by defendants to Sheridan, which loans were

12  secured by assets belonging to Plaintiffs and/or guaranteed by Plaintiffs, was instead

13  paid to junior creditors that had no security interest in the Sheridan Assets. The

14  dissipation of such assets to creditors was done at the direction of Michael Olsen,

15  who nominally was Sheridan's CEO, but whose salary was paid by DBZ or DBZLP

16  and who acted on behalf of and as an agent for DBZ, DBZLP and the other

17  defendants. Moreover, when defendants ultimately caused a foreclosure sale of

18  Sheridan Assets to occur, the foreclosure sale was poorly organized, done on only

19  10 days notice, and otherwise failed to meet the requirements of law. There were no

20  bidders. DBZ or another DBZLP affiliate credit bid $5 million, and transferred the

21  assets to a new entity called Indie Blu which DBZ owns or which is otherwise

22  affiliated with DBZ or DBZLP. They once again hired Michael Olsen, Sheridan's

23  former CEO, to run that entity. Plaintiffs also subsequently learned that, during the

24  time that Mr. Olsen was a full time employee and CEO of Sheridan, he was also

25  separately employed and compensated by DBZ or DBZLP to perform work with

26  respect to other companies and assets which DBZ owned or with which DBZLP was

27  affiliated.

Mitchell
Silberberg &
Knupp LLP

2961239.2

28

31

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1    56.    Prior to May of 2008, CT1 and its subsidiaries and affiliates were able
2    to finance their motion pictures and successfully manage and run their business
3    operations. After May of 2008, Plaintiffs' operations were substantially impacted by
4    DBZ's financial deterioration.  Because DBZ loaded Plaintiffs up with high interest
5    debt and obligations and failed to provide the promised Revolver, at the same time
6    refusing to release any film collateral to make way for new financing, or allow any
7    of the Pictures to be refinanced, the film collateral was impaired, and the business
8    operations of Plaintiffs suffered.

9    57.    In summary, in September of 2007, Plaintiffs in the aggregate owed
10   $75 million in loans to defendants, with a further obligation to Sheridan of $4
11   million. All the loans were in compliance, and none were in default. None of the
12   loans were personally guaranteed by Tutor. Within six months of DBZ's and
13   DBZLP's financial collapse, defendants claimed that, as a result of the renegotiated
14   and new loans, Plaintiffs purportedly owed an overall $180 million to defendants
15   and virtually the entire amount defendants claimed was personally guaranteed by
16   Tutor and/or Bergstein.  Plaintiffs received no value for this increase in alleged
17   liability or the new guaranties provided in reliance on defendants' false promises
18   regarding the Revolver.  The renegotiation of the old loans and the agreement to the
19   new loans were done as a prelude to a Revolver which was never provided, and
20   could never have been provided given DBZ's and DBZLP's rapidly deteriorating
21   financial condition and ultimate collapse.  Following May 2008, defendants' actions
22   resulted in Plaintiffs' business operations being substantially impaired because of
23   their inability to obtain any alternative financing or equity and a significant
24   deterioration of the value of the film assets.

25   58.    By May of 2009, desperate for cash and by then plainly unable to
26   move forward with the long-promised $250 million Revolver, defendants were
27   pressuring Plaintiffs to repay the vast sums defendants claimed to be owed under the

Mitchell
Silberberg &  28
Knupp LLP
2961239.2

32

1   Capitol Loan, the ThinkFilm Loans, the CT1 Loan, and the Stopping Power Loan by

2   threatening to shut down CT1 and its subsidiaries and affiliates, seizing all their

3   assets, and wrecking the film production and distribution business that had been

4   built by Plaintiffs.

5          59.     As a consequence, in May 2009, LAAC, a company formed by the

6   ultimate owners of CT1 and its subsidiaries and affiliates, was induced by

7   defendants' actions, intimidation and threats to enter into a "Note Purchase and Sale

8   Agreement" (the "LAAC Agreement"), whereby in essence it agreed to pay off

9   DBZ, BNL and Hemlock on the various loans described above through a series of

10  payments which ostensibly were for the purchase of those obligations from

11  defendants.  LAAC has paid Defendants not less than $45 million pursuant to the

12  LAAC Agreement.  Defendants have failed and refused, despite repeated request, to

13  provide LAAC or the other Plaintiffs with any accounting concerning the

14  application of the funds paid by LAAC to principal and interest on the various

15  alleged obligations of Plaintiffs.  Defendants have further breached the LAAC

16  Agreement and the covenant of good faith and fair dealing implied therein and

17  threaten to cause the consideration for LAAC's payments and performance under

18  the LAAC Agreement to fail entirely by, among other things, (a) interfering with

19  LAAC's efforts to foreclose on the loans it purchased from defendants, and

20  (b) refusing to transfer additional loans as promised in exchange for further

21  payments under the LAAC Agreement.  Plaintiffs other than LAAC are informed

22  and believe and on that basis allege that a substantial portion of the payments made

23  by LAAC resulted in the receipt by defendants of usurious interest under some or all

24  of the loans discussed hereinabove.

25         60.     Plaintiffs are informed and believe, and on that basis allege that, as of

26  on or about June 1, 2009, Fortress succeeded to the rights and interests of DBZ in

27

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

33

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1  and to the loans and other transactions between DBZ and Plaintiffs by agreement or

2  assignment, and assigned the management of the DBZ and BNL funds to FVRF.

## FIRST CAUSE OF ACTION

**(By Tutor, Bergstein, NM Productions LLC, Production Management Services LLC, Capitol Films U.S. LLC, Capitol Films Production LLC, Reel Transit Investments LLC, Reel Transit Productions LLC, Sandfairy Productions Limited, Psammed Productions (IOM) Limited, Beautiful Films Limited, Reel Lucky Limited, Sandfairy Merchandising Limited, Capitol Films Production Limited, Harmony Productions (UK) Limited, Reel Dusty LLC, Reel Snowy LLC, Reel Devilish LLC, Reel Transit LLC, Reely Good Times Limited, Mobprod 06 Inc., Mobius .45 Productions LLC, Bordertown Productions LLC, Bordertown Productions Inc., Wendell Productions Inc., Wendell Distribution Inc., Lake Productions Inc., Lake Distribution Inc., Dead Fish Distribution Inc., Chaos Distribution Inc., CFG, Capitol Film Partners Limited, CUSFH, Capco/TF, TF Canadian Library Holdings LLC, TF Canada Acquisition Corporation, TF Canada Services Corporation, FOTP Productions Inc., Five Dollar Productions LLC, Reel Clandestine LLC, Fade Out Productions LLC, TBT Productions LLC, Clairvoyant Productions Inc., The Last Word Movie LLC, Scheherezade Films Limited, Reel Mary Limited, Reel Mary Productions Limited, CFA, Zoopraxis, FPLAC, Chaotic Films UK Limited, Chaotic Productions Ltd., Lavender Productions LLC, Cerulean Productions LLC, BLAC LLC and Stopping Power Productions LLC Against DBZ, BNL, HEMLOCK, DBZLP and Fortress for Rescission Based on Fraud)**

24      61.      Plaintiffs Tutor, Bergstein, NM Productions LLC, Production

25  Management Services LLC, Capitol Films U.S. LLC, Capitol Films Production

26  LLC, Reel Transit Investments LLC, Reel Transit Productions LLC, Sandfairy

27  Productions Limited, Psammed Productions (IOM) Limited, Beautiful Films

1   Limited, Reel Lucky Limited, Sandfairy Merchandising Limited, Capitol Films

2   Production Limited, Harmony Productions (UK) Limited, Reel Dusty LLC, Reel

3   Snowy LLC, Reel Devilish LLC, Reel Transit LLC, Reely Good Times Limited,

4   Mobprod 06 Inc., Mobius .45 Productions LLC, Bordertown Productions LLC,

5   Bordertown Productions Inc., Wendell Productions Inc., Wendell Distribution Inc.,

6   Lake Productions Inc., Lake Distribution Inc., Dead Fish Distribution Inc., Chaos

7   Distribution Inc., CFG, Capitol Film Partners Limited, CUSFH, Capco/TF, TF

8   Canadian Library Holdings LLC, TF Canada Acquisition Corporation, TF Canada

9   Services Corporation, FOTP Productions Inc., Five Dollar Productions LLC, Reel

10  Clandestine LLC, Fade Out Productions LLC, TBT Productions LLC, Clairvoyant

11  Productions Inc., The Last Word Movie LLC, Scheherezade Films Limited, Reel

12  Mary Limited, Reel Mary Productions Limited, CFA, Zoopraxis, FPLAC, Chaotic

13  Films UK Limited, Chaotic Productions Ltd., Lavender Productions LLC, Cerulean

14  Productions LLC, BLAC LLC and Stopping Power Productions LLC (the "CT1

15  Plaintiffs") incorporate herein each and every allegation set forth in paragraphs 1

16  through 60, inclusive, hereinabove.

17      62.     Defendants knew that each of the statements and representations

18  alleged in paragraphs 33, 34, 37 and 44 above was false at the time it was made, and

19  intended to induce the CT1 Plaintiffs to rely upon such fraudulent statements as

20  alleged in paragraphs 28 through 45 hereinabove.

21      63.  ·   In acting and entering into the loans and other agreements as alleged

22  herein, the CT1 Plaintiffs reasonably relied on the representations made by

23  defendants as alleged herein.

24      64.     At the time that the foregoing representations were made and the CT1

25  Plaintiffs so acted and entered into said agreements, Plaintiffs had no knowledge of

26  the falsity of defendants' representations.

27

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

35

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1        65.     Defendants' misrepresentations and omissions as alleged hereinabove

2   were material to the CT1 Plaintiffs' decisions to so act and enter into said

3   agreements, and the CT1 Plaintiffs would not have so acted or entered into such

4   agreements had they known the true facts.

5        66.     As a consequence of defendants' fraud and misrepresentation, the

6   CT1 Plaintiffs are entitled to rescind each and every loan, guaranty, pledge, security

7   agreement and other agreement entered into in reliance on defendants' fraud and

8   misrepresentations alleged hereinabove.

9   **SECOND CAUSE OF ACTION**

10  **(By Tutor, Bergstein, Sheridan Square Entertainment Inc., SSE Guaranty**

11  **Company and BT Music  LLC Against DBZ, BNL, HEMLOCK, DBZLP and**

12  **Fortress for Rescission Based on Fraud)**

13       67.     Plaintiffs Tutor, Bergstein, Sheridan Square Entertainment Inc., SSE

14  Guaranty Company and BT Music (collectively the "Sheridan Plaintiffs")

15  incorporate herein each and every allegation set forth in paragraphs 1 through 60,

16  inclusive, hereinabove.

17       68.     Defendants knew that each of the statements and representations

18  alleged in paragraph 28 above was false at the time it was made, and intended to

19  induce the Sheridan Plaintiffs to rely upon such fraudulent statements as alleged in

20  paragraphs 30 and 31 hereinabove.

21       69.     In acting and entering into the loans and other agreements as alleged

22  herein, the Sheridan Plaintiffs reasonably relied on the representations made by

23  defendants as alleged herein.

24       70.     At the time that the foregoing representations were made and the

25  Sheridan, Plaintiffs so acted and entered into said agreements, Plaintiffs had no

26  knowledge of the falsity of defendants' representations.

27

28

Mitchell
Silberberg &
Knupp LLP
2961239.2

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

71.     Defendants' misrepresentations and omissions as alleged hereinabove were material to the Sheridan Plaintiffs' decisions to so act and enter into said agreements, and the Sheridan Plaintiffs would not have so acted or entered into such agreements had they known the true facts.

72.     As a consequence of defendants' fraud and misrepresentation, the Sheridan Plaintiffs are entitled to rescind each and every loan, guaranty, pledge, security agreement and other agreement entered into in reliance on defendants' fraud and misrepresentations alleged hereinabove.

## THIRD CAUSE OF ACTION

### (By Plaintiffs Other than LAAC Against All Defendants for
### Damages Based on Fraud)

73.     Plaintiffs other than LAAC incorporate herein each and every allegation set forth in paragraphs 1 through 72, inclusive, hereinabove.

74.     Plaintiffs other than LAAC have suffered damages as a proximate result of defendants' fraud in an amount as yet unknown but which Plaintiffs are informed and believe and on that basis allege exceeds $100 million.

75.     In acting as alleged hereinabove, defendants, and each of them, are guilty of fraud, oppression and malice as defined in California Civil Code Section 3294.  Accordingly, Plaintiffs other than LAAC are entitled to punitive and exemplary damages against defendants, and each of them.

## FOURTH CAUSE OF ACTION

### (By All Plaintiffs Against All Defendants for an Accounting)

76.     Plaintiffs incorporate herein each and every allegation set forth in paragraphs 1 through 72, inclusive, hereinabove.

77.     Plaintiffs have repeatedly requested that defendants provide an accounting as to all advances, fees, costs, interest accruals, payments, allocations of

Mitchell
Silberberg &
Knupp LLP
2961239.2

37

1  payments to principal, interest, fees or costs with respect to each of the loans
2  identified hereinabove.

3      78.    Defendants have failed and refuse to provide the requested
4  accountings, despite contractual and legal obligations to do so.

5      79.    Plaintiffs are entitled to a full accounting as to said loans.

## FIFTH CAUSE OF ACTION

### (By Plaintiffs Other Than LAAC Against All Defendants for
### Restitution, Damages, and Penalties Under Civil Code
### § 1916.12-1 et seq. and Cal. Const. Art. XV, § 1)

10     80.    Plaintiffs incorporate herein each and every allegation set forth in
11 paragraphs 1 through 60, inclusive, hereinabove.

12     81.    The interest and fees charged and collected by Defendants from
13 Plaintiffs, either through withholding sums from loan distributions or from
14 payments by or on behalf of Plaintiffs, was usurious and unlawful under Civil Code
15 § 1916.12-1 *et seq*. and Cal. Const. Art. XV, § 1.

16     82.    Plaintiffs are entitled to damages in the full amount of all interest,
17 fees and costs charged to, withheld from and/or paid by or on behalf of any of
18 Plaintiffs to any of defendants under the aforementioned loans.

19     83.    In addition, Plaintiffs are entitled to trebled damages of all such
20 amounts charged, withheld and/or paid.

## SIXTH CAUSE OF ACTION

### (By Plaintiffs Other Than LAAC Against All Defendants for Lender Liability)

23     84.    Plaintiffs other than LAAC incorporate herein each and every
24 allegation set forth in paragraphs 1 through 83, inclusive, hereinabove.

25     85.    By, among other things, insisting that Plaintiffs borrow the funds
26 necessary to finance their operations only from defendants in order to qualify for the
27 promised Revolver, defendants assumed a duty to act in good faith and to take such

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

38

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1  steps as were reasonably necessary to allow Plaintiffs to make, complete and

2  distribute the films within Plaintiffs' libraries.

3      86.    Defendants were well aware that Plaintiffs depended on continued

4  financing and reasonable cooperation from defendants to operate Plaintiffs' business

5  and to be able to repay the funds borrowed from defendants.

6      87.    Nevertheless, defendants refused to cooperate reasonably with

7  Plaintiffs, violated the covenant of good faith and fair dealing, and breached their

8  duties to Plaintiffs, as alleged hereinabove and otherwise.

9      88.    Defendants' duties to Plaintiffs were fiduciary or quasi-fiduciary in

10  nature.

11      89.    As a result of defendants breaches of duty, Plaintiffs sustained

12  damages in an amount presently unknown but which they believe exceeds

13  $100 million.

14      90.    In conducting themselves as alleged hereinabove, defendants acted

15  with fraud, oppression and malice as those terms are defined in California Civil

16  Code § 3294.  As a result, Plaintiffs are entitled to exemplary and punitive damages

17  against each of defendants.

18                    **SEVENTH CAUSE OF ACTION**

19      **(By LAAC Against DB Zwirn Special Opportunities Fund, LLC, Bernard**

20      **National Loan Investors, Ltd., and Hemlock for Rescission and Restitution)**

21      91.    LAAC incorporates herein each and every allegation set forth in

22  paragraphs 49 through 60 and 76 through 79, inclusive, hereinabove.

23      92.    Plaintiffs other than LAAC contend that each of the loans made by

24  defendants to or guarantied by Plaintiffs other than LAAC are usurious and/or were

25  induced by fraud, and seek rescission thereof.  In addition, said Plaintiffs

26  alternatively seek relief including elimination of all interest obligations and

27

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1  reduction of principal obligations by all amounts previously paid to defendants by or
2  on behalf of said Plaintiffs.

3    93.    If the contentions of Plaintiffs other than LAAC are correct and
4  upheld, the amounts defendants claimed to be due on the loans which defendants
5  sold to LAAC under the LAAC Agreement were vastly overstated.

6    94.    If the contentions of the Plaintiffs other than LAAC are correct and
7  upheld, then defendants knew or should have known that the loans to Plaintiffs other
8  than LAAC were usurious and/or induced by fraud, that they were void or voidable,
9  and/or that the amounts defendants claimed to be due thereunder were vastly
10  overstated.

11    95.    Nevertheless defendants failed to disclose such facts to LAAC despite
12  knowing that LAAC was relying on the stated balance due on said loans in entering
13  into the LAAC Agreement.

14    96.    If the contentions of Plaintiffs other than LAAC are correct and
15  upheld, then the LAAC Agreement had for its purpose the payment of unlawful and
16  usurious interest to defendants and each of them.  It was therefore illegal, void,
17  unconscionable and against public policy.

18    97.    Further, if the contentions of Plaintiffs other than LAAC are correct
19  and upheld, then there has been a material failure of consideration given to LAAC
20  under the LAAC Agreement.

21    98.    Moreover, LAAC's consent to the LAAC Agreement was compelled
22  by the actions, omissions, threats, economic coercion, and intimidation of
23  defendants alleged hereinabove.

24    99.    As a consequence, in the event that the contentions of Plaintiffs other
25  than LAAC are correct and the Court awards any of the relief sought by them, then
26  LAAC is entitled to rescind the LAAC Agreement, and to the restitution of all sums
27  paid to defendants pursuant thereto.

28

Mitchell
Silberberg &
Knupp LLP
2961239.2

40

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1    100.    LAAC hereby tenders the return of all benefits received by it, if any,

2    as a result of the LAAC Agreement, to the extent necessary to obtain rescission.

3                          **EIGHTH CAUSE OF ACTION**

4        **(By LAAC Against DB Zwirn Special Opportunities Fund LLC, Bernard**

5        **National Loan Investors, Ltd. and Hemlock for Rescission and Restitution)**

6        101.    LAAC incorporated herein each and every allegation set forth in

7    paragraphs 4 through 60 and 76 through 79, inclusive, hereinabove.

8        102.    DBZ, BNL, Hemlock and each of them knew that it was LAAC's

9    intention to enforce the loans it acquired under the LAAC transaction, and to

10   foreclose against the assets securing said loans in the event that the obligors

11   thereunder failed to pay.  DBZ, BNL, and Hemlock knew that the right to foreclose

12   was a material part of the consideration received by LAAC under the LAAC

13   Agreement.

14       103.    Nevertheless, DBZ, BNL and Hemlock have interfered with LAAC's

15   efforts to enforce the loans it acquired, and LAAC's efforts to foreclose on the

16   assets securing those loans.

17       104.    Said conduct constitutes a breach of the good faith covenant implied

18   in the LAAC Agreement.

19       105.    Moreover, if DBZ, BNL and Hemlock continue and are successful in

20   their efforts to block LAAC's efforts to enforce the loans and foreclose, then, they

21   will have caused the consideration provided to LAAC under the LAAC Agreement

22   to fail.

23       106.    If such conduct continues and is successful, LAAC will be entitled to

24   rescind the LAAC Agreement and to restitution of all sums paid to defendants

25   thereunder.

26       107.    LAAC hereby tenders the returns of all benefits received by it, if any,

27   as a result of the LAAC Agreement, to the extent necessary to obtain rescission.

Mitchell
Silberberg &
Knupp LLP

2961239.2

28

41

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1

## NINTH CAUSE OF ACTION

2

### (By LAAC Against DB Zwirn Special Opportunities Fund, LLC, Bernard

3

### National Loan Investors, Ltd., Hemlock [Others] for Damages for Breach of

4

### Contract and Good Faith Covenant)

5      108.    LAAC incorporates herein each and every allegation set forth in

6  paragraphs 4 through 60 and 76 through 79 and 92 through 107, inclusive,

7  hereinabove.

8      109.    Defendants have therefore materially breached the LAAC Agreement

9  and the covenant of good faith and fair dealing implied therein.

10      110.    As a result of the matters alleged above LAAC's further performance

11  under the LAAC Agreement is excused.

12      111.    As a proximate result of defendants' breaches and other wrongdoing,

13  LAAC has suffered damages in an amount presently unknown but which LAAC

14  believes to exceed $45 million.

15

### TENTH CAUSE OF ACTION

16

### (By LAAC Against All Defendants for Money Had and Received)

17      112.    LAAC incorporates herein each and every allegation set forth in

18  paragraphs 4 through 60, 76 through 79, and 92 through 111, inclusive, hereinabove.

19      113.    If the contentions of Plaintiffs other than LAAC are correct and

20  upheld, then within the past two years, LAAC has paid to defendants not less than

21  $45 million, some or all of which represented usurious, unlawful and uncollectable

22  interest, none of which defendants are lawfully entitled to retain.

23      114.    Accordingly, LAAC is entitled to recover all such sums had and

24  received by defendants.

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

# ELEVENTH CAUSE OF ACTION

## (By All Plaintiffs Against All Defendants for Declaratory Relief)

115.   Plaintiffs other than LAAC incorporate herein each and every allegation set forth in paragraphs 1 through 90, inclusive hereinabove.

116.   A dispute has arisen among the parties concerning the matters alleged hereinabove, and in particular concerning the enforceability of the various loans and guaranties described above, and the interest rates thereunder.

117.   Plaintiffs other than LAAC contend that each of the loans, and each of the pledges, securities agreements, guaranties and other related agreements identified above, is usurious, unconscionable, illegal and unenforceable.

118.   Plaintiffs other than LAAC have made or caused to be made millions of dollars in payments in connection with the aforementioned loans, including millions of dollars in interest payments, fees and costs at illegal and usurious rate either withheld from loan proceeds or paid by or on behalf of Plaintiffs other than LAAC to defendants.  Accordingly and alternatively, Plaintiffs other than LAAC contend that because each of the loans identified above is usurious, unconscionable and illegal, any obligation on the part of Plaintiffs other than LAAC or other obligors or guarantors to pay interest thereon is unenforceable and that all such payments made by or withheld from Plaintiffs must be trebled under Civil Code § 1916.12-1 *et seq.* and Cal. Const. Art. XV, § 1, and the trebled amount must be treated as reductions of the principal balance of the loans.

119.   Alternatively, Plaintiffs contend that because each of the loans identified above is usurious, unconscionable and illegal, any obligation on the part of Plaintiffs other than LAAC or other obligors or guarantors to pay interest thereon is unenforceable, and all payments made or withheld to date, including all fees and costs charged to or paid by Plaintiffs other than LAAC, as well any sums received

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF; DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER LIABILITY AND RICO VIOLATIONS

1    by defendants from any party on account of the loans, must be treated as reductions

2    of the principal balance of said loans.

3        120.    Plaintiffs other than LAAC are informed and believe that defendants

4    contest the contentions set forth above and contend otherwise.

5        121.    Accordingly, Plaintiffs other than LAAC seek a declaration that their

6    contentions stated in paragraph 117 hereinabove are correct, and that the loans,

7    pledges, security agreements, guaranties and other related agreements are void and

8    unenforceable.

9        122.    Alternatively, Plaintiffs other than LAAC seek a declaration that their

10   contentions stated in paragraph 118 hereinabove are correct, and that any obligation

11   on the part of Plaintiffs other than LAAC or other obligors or guarantors to pay

12   interest thereon is unenforceable, and all payments made or withheld to date,

13   including all fees and costs charged by or paid to Plaintiffs other than LAAC, as

14   well any sums received by defendants from any party on account of the loans, must

15   be trebled and the trebled amounts treated as reductions of the principal balance of

16   said loans.

17       123.    Alternatively, Plaintiffs other than LAAC seek a declaration that their

18   contentions stated in paragraph 119 hereinabove are correct, and that any obligation

19   on the part of Plaintiffs other than LAAC or other obligors or guarantors to pay

20   interest thereon is unenforceable, and all payments made or withheld to date,

21   including all fees and costs charged by or paid to Plaintiffs other than LAAC, as

22   well any sums received by defendants from any party on account of the loans, must

23   be treated as reductions of the principal balance of said loans.

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

44

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

# TWELFTH CAUSE OF ACTION

## (By Plaintiffs Other Than LAAC Against All Defendants for Violation of Racketeer Influenced And Corrupt Organizations Act)

124.    Plaintiffs other than LAAC incorporate herein each and every allegation set forth in paragraphs 1 through 114, inclusive hereinabove.

125.    Daniel Bernard Zwirn, Steven Campbell, DBZ, BNL, Hemlock, DBZLP, Fortress and Does 1-100 are individually "persons" as defined in 18 U.S.C. § 1961(3).

126.    Plaintiffs other than LAAC are informed and believe and on that basis allege that beginning at various times from approximately 2006 through and including the present, in California and elsewhere, defendants were employed by and associated-in-fact with an enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "Zwirn Criminal Enterprise").  The Zwirn Criminal Enterprise is made up of Daniel Bernard Zwirn, Steven Campbell, DBZ, BNL, Hemlock, DBZLP, Fortress and certain of the Doe defendants.

127.    Plaintiffs other than LAAC are informed and believe and on that basis allege that defendants and certain of the Doe defendants, for the purpose of executing and attempting to execute the scheme to obtain illegal interest in order to manufacture profits from themselves and inflate the portfolio from which they could take fees, and then to conceal their misconduct by means of tortious, fraudulent and criminal conduct, did unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of the Zwirn Criminal Enterprise's affairs through the collection of unlawful debts, as defined in 18 U.S.C. § 1961(6), which are unenforceable under California usury law, were incurred in connection with the business of lending money, and were made at a rate more than twice the enforceable rate in the state of California, as described more fully herein.

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF; DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER LIABILITY AND RICO VIOLATIONS

128.    Plaintiffs other than LAAC are informed and believe, and on that basis allege, that defendants received income derived from the collection of an unlawful debt, as more fully described above, and invested such income, and proceeds of such income, in the Zwirn Criminal Enterprise, in violation of 18 U.S.C. § 1962(a).

129.    Plaintiffs other than LAAC are informed and believe, and on that basis allege, that defendants maintained, directly or indirectly, an interest in or control of the Zwirn Criminal Enterprise, through collection of an unlawful debt, in violation of 18 U.S.C. § 1962(b).

130.    Plaintiffs other than LAAC are informed and believe, and on that basis allege, that defendants conducted and participated in the affairs of the Zwirn Criminal Enterprise through the collection of the unlawful debts alleged above, in violation of 18 U.S.C. § 1962(c).

131.    Plaintiffs other than LAAC are informed and believe, and on that basis allege, that defendants conspired with each other and with others to commit the acts alleged above, in violation of 18 U.S.C. § 1962(d).

132.    In addition, Plaintiffs other than LAAC are informed and believe, and on that basis allege, that defendants and certain of the Doe defendants, for the purpose of executing and attempting to execute the scheme to obtain illegal interest in order to inflate the portfolio from which they could take fees, and then to conceal their misconduct by means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of the Zwirn Criminal Enterprise's affairs through a pattern of racketeering activity.  Their actions include multiple, related acts in violation of: 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud); Cal. Pen. Code § 518 (extortion); and 18 U.S.C. § 1957 (use of unlawful funds).

Mitchell
Silberberg &
Knupp LLP

2961239.2

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF; DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER LIABILITY AND RICO VIOLATIONS

1    133.    The pattern of racketeering activity, as defined by 18 U.S.C.

2  §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat

3  of continuing criminal activity.  That activity consists of multiple acts of

4  racketeering by each member of the Zwirn Criminal Enterprise, is interrelated, not

5  isolated, and is perpetrated for the same or similar purposes by the same persons.

6  This activity has extended over a substantial period of time, at least up to the date of

7  the original filing of this civil action.  These activities occurred after the effective

8  date of 18 U.S.C. §§ 1961 *et seq.*, and the last such act occurred within 10 years

9  after the commission of a prior act of racketeering activity.  Plaintiffs are informed

10  and believe, and on that basis allege, that this racketeering activity included:

11    134.    Mail Fraud:  Defendants, as well as some or all of the other members

12  of the Zwirn Criminal Enterprise, aided and abetted by each other, having devised a

13  scheme to defraud Plaintiffs other than LAAC of their property by charging and

14  collecting usurious interest without disclosing that at least one of defendants was not

15  a licensed California Finance Lender, and having devised a further scheme to

16  deprive Plaintiffs other than LAAC of their property as part of a scheme to defraud

17  investors (both by failing to disclose that its loan portfolio was artificially inflated

18  and subsequently by covering up the fact that it was experiencing substantial losses)

19  did, for the purpose of executing such schemes to defraud, did knowingly use, and

20  aid and abet the use, on numerous occasions, of mail depositories of the United

21  States Postal Service by both placing and causing to be placed interstate letters and

22  other mailable matter in the depositories, and by removing and causing to be

23  removed interstate letters and other mailable matter from the depositories.  Such

24  events include the mailing and receipt of numerous letters demanding and/or

25  relating to the collection of illegal and usurious debts, and the falsifying of profits

26  and asset values in order to justified unearned fees, and the covering up of

27  investment losses, all in violation of 18 U.S.C. § 1341.

Mitchell
Silberberg &
Knupp LLP

2961239.2

28

47

1    135.   Wire Fraud:  Defendants, as well as some or all of the other members

2    of the Zwirn Criminal Enterprise, aided and abetted by each other, having devised a

3    scheme to defraud Plaintiffs of their property by charging and collecting usurious

4    interest without disclosing that at least one of defendants was not a licensed

5    California Finance Lender, and having devised a further scheme to deprive Plaintiffs

6    other than LAAC of their property as part of a scheme to defraud investors (both by

7    failing to disclose that its loan portfolio was artificially inflated and subsequently by

8    covering up the fact that it was experiencing substantial losses) did, for the purpose

9    of executing such schemes to defraud, knowingly transmit and cause to be

10   transmitted, by means of wire communications in interstate and foreign commerce,

11   writing, signs, signals, pictures or sound that included electronic transmissions

12   demanding and/or relating to the collection of illegal and usurious debts, and the

13   covering up of investment losses, all in violation of 18 U.S.C. § 1343.

14   136.   Extraterritorial Transfers:  Defendants, aided and abetted by some or

15   all of the remaining members of the Zwirn Criminal Enterprise, as part of their

16   pattern racketeering activity, did transport, transmit, or transfer, or attempt to

17   transport, transmit, or transfer a monetary instrument or funds from a place in the

18   United States to or through a place outside the United States, including the Cayman

19   Islands, or to a place in the United States from or through a place outside the United

20   States, including the Cayman Islands, with the intent to promote the carrying on of

21   the mail fraud, wire fraud and bankruptcy fraud, as described above.  Each such

22   transportation, transmission, or transfer or attempted transportation, transmission, or

23   transfer in connection with the above schemes constitutes a separate and distinct

24   violation of 18 U.S.C. § 1956(a)(2).

25   137.   State Law Extortion:  Defendants, aided and abetted by some or all of

26   the remaining members of the Zwirn Criminal Enterprise, as part of their pattern of

27   racketeering activity, and as more fully described above, obtained the property of

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

48

1   Plaintiffs other than LAAC, with their consent induced by a wrongful use of force or

2   fear, in violation of California Penal Code section 518 *et. seq.* Such use of fear

3   included threats to do an unlawful injury to the property of the defendants

4   threatened. Among other things, such threats include defendants' threats to shut

5   down Plaintiffs' film production and distribution business.

6        138.   <u>Use Of Unlawful Funds:</u> Defendants, aided and abetted by some or

7   all of the remaining members of the Zwirn Criminal Enterprise, as part of their

8   pattern racketeering activity, knowingly engaged and attempted to engage in a

9   monetary transaction in criminally derived property of a value greater than $10,000.

10  Such criminally derived property was derived from the mail fraud, wire fraud, usury

11  and other conduct described above. Each such monetary transaction and attempted

12  monetary transaction constitutes a separate and distinct violation of 18 U.S.C.

13  § 1957.

14       139.   Plaintiffs other than LAAC are informed and believe, and on that

15  basis allege, that defendants received income derived from the pattern of

16  racketeering activity, as more fully described above, and invested such income, and

17  proceeds of such income, in the Zwirn Criminal Enterprise, in violation of 18 U.S.C.

18  § 1962(a).

19       140.   Plaintiffs other than LAAC are informed and believe, and on that

20  basis allege, that defendants conducted the affairs of the Zwirn Criminal Enterprise

21  through the pattern of racketeering activity alleged above, in violation of 18 U.S.C.

22  § 1962(c).

23       141.   Plaintiffs other than LAAC are informed and believe, and on that

24  basis allege, that defendants conspired with each other and with others to commit

25  the acts alleged above, in violation of 18 U.S.C. § 1962(d).

26       142.   As a direct and proximate result of the conduct and violations of

27  defendants as herein above alleged, Plaintiffs other than LAAC have been damaged

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1   in their business and property in an amount that they are presently unable to

2   ascertain.  Plaintiffs other than LAAC will seek leave to amend this complaint to

3   allege the amount of such damage when they have ascertained the same.

4         143.    In addition, Plaintiffs other than LAAC are entitled to threefold the

5   damages they sustain and the cost of the suit, including a reasonable attorney's fee,

6   pursuant to 18 U.S.C. § 1964.

7                          **PRAYER FOR RELIEF:**

8         WHEREFORE, Plaintiffs pray as follows:

9         A.    On the First and Second Causes of Action, for rescission of each and

10  every loan, guaranty, pledge, security agreement and other agreement entered into in

11  reliance on defendants' fraud and misrepresentations as alleged herein;

12        B.    On the Third Cause of Action,

13              (i)    For compensatory damages according to proof, and

14              (ii)   For punitive and exemplary damages against defendants and

15        each of them;

16        C.    On the Fourth Cause of Action, for a full accounting by defendants as

17  to all loans;

18        D.    On the Fifth Cause of Action, actual and trebled damages according to

19  proof;

20        E.    On the Sixth Cause of Action,

21              (i)    For compensatory damages according to proof; and

22        F.    For punitive and exemplary damages against defendants and each of

23  them;

24        G.    On the Seventh and Eighth Causes of Action,

25              (i)    For an order that the LAAC Agreement be rescinded, and

26              (ii)   For restitution of all sums paid to defendants by LAAC.

27

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

H.   On the Ninth Cause of Action, for damages according to proof;

I.   On the Tenth Cause of Action, actual and trebled damages according to proof;

J.   On the Eleventh Cause of Action, for a declaration in favor of Plaintiffs other than LAAC

(i)   that each of the Capitol Loan, the Stopping Power Loan, the BWT Loan, the Individual Capitol Loans, the ThinkFilm Loans, and the CT1 Loan is usurious, unconscionable and illegal, and that said loans, and all pledge agreements, security agreements, guaranties and other agreements relating thereto are unenforceable; or

(ii)   in the alternative, that each of the loans identified above is usurious, unconscionable and illegal, that any obligation on the part of Plaintiffs other than LAAC or other obligors or guarantors to pay interest thereon is unenforceable and that all payments withheld from loan proceeds or made by or on behalf of Plaintiffs other than LAAC must be trebled under Civil Code § 1916.12-1 *et seq.* and Cal. Const. Art. XV, § 1, and the trebled amounts treated as reductions of the principal balance of the loans; or

(iii)   in the alternative, that each of the Capitol Loan, the Stopping Power Loan, the BWT Loan, the Individual Capitol Loans, the ThinkFilm Loan, and the CT1 Loan is usurious, unconscionable, and illegal, and that any obligation on the part of Plaintiffs other than LAAC or other obligors or guarantors to pay interest thereon is unenforceable, and all payments made to date, including all fees and costs charged to or paid by Plaintiffs other than LAAC, as well any sums received by defendants from any party on account of the loans, must be treated as reductions of the principal balance of said loans.

Mitchell
Silberberg &
Knupp LLP

2961239.2

51

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF; DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER LIABILITY AND RICO VIOLATIONS

1         K.     Under the Twelfth Cause of Action for actual and trebled damages

2 according to proof;

3         L.     On all causes of action for attorneys' fees;

4         M.    On all causes of action for costs of suit incurred herein; and

5         N.     Such other and further relief as the Court may deem proper.

6

7 DATED: October 6, 2010              MITCHELL SILBERBERG & KNUPP LLP

8                                      JEAN PIERRE NOGUES

9                                        LUCIA E. COYOCA

10                             By:

11                                 Lucia E. Coyoca
                                Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

52

1

## **DEMAND FOR JURY TRIAL**

2     Plaintiffs hereby demand a trial by jury on all matters and issues so triable.

3

4     DATED:  October 6, 2010

MITCHELL SILBERBERG & KNUPP LLP
5     JEAN PIERRE NOGUES
LUCIA E. COYOCA

6

7     By:

Lucia E. Coyoca
8     Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Mitchell
Silberberg &
Knupp LLP

2961239.2

28                                    53

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS

1

## PROOF OF SERVICE

2    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3         I am employed in the county of Los Angeles, State of California. I am over
     the age of 18 and not a party to the within action. My business address is Mitchell
4    Silberberg & Knupp LLP, 11377 West Olympic Boulevard, Los Angeles, California
     90064-1683.

5
          On October 6, 2010, I served a copy of the foregoing document(s) described
6    as **SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION &
     RESTITUTION; DECLARATORY RELIEF; DAMAGES & PENALTIES
7    UNDER CIVIL CODE § 1916.12-1 ET SEQ. AND CAL. CONST. ART. XV,
     §1; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
8    LIABILITY; AND DAMAGES FOR VIOLATION OF THE RACKETEER
     INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961
9    ET SEQ.** on the interested parties in this action at their last known address as set
     forth below by taking the action described below:

10

11   *Attorneys for Defendants*                 *Attorneys for Defendant*
     *D.B. Zwirn Special Opportunities Fund,*    *Daniel B. Zwirn*
12   *LLC, Bernard National Loan Investors,*
     *Ltd., and Hemlock (Lux) S.A.R.L.*
13
     Howard J. Rubinroit, Esq.                   Howard M. Privette, Esq.
14   Robert A. Holland, Esq.                     D. Scott Carlton, Esq.
     David R. Carpenter, Esq.                    John J. O'Kane IV, Esq.
15   Sidley Austin LLP                           Paul, Hastings, Janofsky & Walker LLP
     555 West Fifth Street                       515 South Flower Street
16   Suite 4000                                  Twenty-fifth Floor
     Los Angeles, CA 90013-1010                  Los Angeles, CA 90071
17                                               Telephone:  (213) 683 6000
     Telephone:  (213) 896-6000                  Facsimile:  (213) 996 3113
18   Facsimile:  (213) 896-6600
                                                 EMAIL:
19   EMAIL:     hrubinroit@sidley.com                scottcarlton@paulhastings.com
                rholland@sidley.com
20              drcarpenter@sidley.com

21

22

23

24

25

26

27

Mitchell
Silberberg &
Knupp LLP

2961239.2

28                                    54

1  *Attorneys for Defendant*
   *Fortress Investment Group, LLC*

2

3  Christopher M. Ledford, Esq.
   Skadden, Arps, Slate, Meagher & Flom
   LLP

4  300 South Grand Avenue
   Los Angeles, CA 90071-3137

5

6  Telephone:  (213) 687-5000
   Facsimile:   (213) 687.5600

7  EMAIL:
       christopher.ledford@skadden.com

8

9

10

11  ☒ **BY PLACING FOR COLLECTION AND MAILING:**  I placed the above-
       mentioned document(s) in sealed envelope(s) addressed as set forth above, and

12  placed the envelope(s) for collection and mailing following ordinary business
       practices.  I am readily familiar with the firm's practice for collection and

13  processing of correspondence for mailing with the United States Postal Service.
       Under that practice it would be deposited with the U.S. Postal Service on that

14  same day with postage thereon fully prepaid at 11377 West Olympic Boulevard,
       Los Angeles, California 90064-1683 in the ordinary course of business.

15

16      I declare under penalty of perjury under the laws of the State of California
       that the above is true and correct.

17      Executed on October 6, 2010, at Los Angeles, California.

18

19                                              Bertha A. García

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

2961239.2

SECOND AMENDED COMPLAINT FOR FRAUD; RESCISSION & RESTITUTION; DECLARATORY RELIEF;
DAMAGES & PENALTIES FOR USURY; MONEY HAD AND RECEIVED; DAMAGES FOR LENDER
LIABILITY AND RICO VIOLATIONS